KELLY, J.
This case involves real property to which plaintiffs seek an easement for the purpose of connecting to a city sewer across the lots of their neighbors. The issues are (1) whether the Land Division Act (LDA)[1] can be used to create substantive property rights, such as a utility easement, (2) whether an easement by necessity for utilities should be allowed in this case, and (3) whether the restrictive covenant that runs with the land in question bars the easement.
*487 The Court of Appeals held that the LDA provides for substantive changes to property rights and gives the trial court the authority to revise the plat to allow a utility easement. It also concluded that an easement by necessity for utilities could appropriately be created in this case and that the restrictive covenant does not bar the easement.
We affirm the result of the Court of Appeals opinion and conclude that the original grantors intended to allow utility access to the Tomeceks’ property through the central drive easement. We agree that the restrictive covenant does not bar the easement. However, we reverse the Court of Appeals holding that the LDA can alter substantive property rights. Finally, it was unnecessary for the Court of Appeals to address whether an easement by necessity should be recognized in Michigan and applied in this case. Therefore, we affirm the Court of Appeals opinion in part, reverse it in part, and vacate it in part.
FACTS
Plaintiffs Frank and Janis Tomecek own property in the O. T. Henkle subdivision along Lake Michigan in Berrien County. They wish to build a house on their property (Lot 2).[2] Defendants claim that a restrictive covenant that runs with the plat prevents plaintiffs from erecting a building on Lot 2. The covenant states that a house cannot be built on Lot 2 “unless and until a municipal sanitary sewer line is made available to the premises.”
Because Lot 2 is landlocked, plaintiffs have an easement[3] (the central easement) over Lots 1 and 3 through *488 which they access their property from Lake Shore Road. Plaintiffs claim that they are entitled to use the central easement to gain access to the municipal sewer line.
A familiarity with the history of the O. T. Henkle subdivision is helpful in understanding this case. In the early 1920s, O. T. Henkle acquired approximately five acres of land on Lake Michigan in Chikaming Township, Berrien County. The property passed from O. T. Henkle to C. W Henkle, Gladys Farclough, and Jane H. Henkle (collectively referred to as “the original grantors”).[4] In 1967, the original grantors conveyed what is now Lot 1 to one of the defendants, reserving an easement for the benefit of Lot 2. The easement runs from Lake Shore Road along the southern boundary of Lot 1.[5]
Over the next few years, the original grantors sold Lots 3, 4, and 5, all subject to an easement running along the southern portion of the property (“the south drive easement”).[6] Lots 3 and 4 were also subject to the central drive easement.[7] In 1975, the plat was recorded in the county records. At the time of platting, Lots 3, 4, and 5 used the south drive easement for utilities access[8] and for right-of-way access. Also, in 1975, the original grantors recorded a restrictive covenant prohibiting the construction of a building on Lot 2 until a municipal sanitary sewer service was made available to the pre *489 mises.[9] Thus, when the property was platted in 1975, both the central and south easements were identically identified as “drive easement” on the plat, and the south easement already had utilities on it.
In 1976, the original grantors conveyed Lot 2 to plaintiffs. When plaintiffs bought Lot 2, the original grantors provided them with a drawing showing a good spot to build a home on the lot.[10]
PROCEDURAL HISTORY
In 2001, plaintiffs requested a variance from the Chikaming Township Zoning Board of Appeals to construct a home on their lot. When the board granted the variance, defendants appealed, claiming that the restrictive covenant prevented plaintiffs from building a home because they did not have sewer access. The trial court granted summary disposition to plaintiffs, ruling that the original grantors intended to allow plaintiffs to build a home on Lot 2. The trial court observed that defendants had already run utility lines on the south easement, and plaintiffs deserved to do the same with their central easement.
A divided Court of Appeals panel affirmed the trial court’s decision in a published opinion.[11] It held that the LDA[12] empowered the trial court to revise the plat to *490 include utilities in the central easement. The LDA, it concluded, permits a trial court to do more than merely correct errors; it may alter a plat to affect underlying substantive property rights. The Court of Appeals held, in addition, that plaintiffs were entitled to an easement by necessity for utilities.
STANDARD OF REVIEW
We review de novo a trial court’s decision on a motion for summary disposition.[13] The extent of a party’s rights under an easement is a question of fact, and a trial court’s determination of the facts is reviewed for clear error.[14] The proper interpretation and application of a statute presents a question of law that we consider de novo.[15]
THE CENTRAL EASEMENT INCLUDED UTILITY ACCESS AT THE TIME OF PLATTING
We must determine if the central easement running from Lake Shore Road to Lot 2 includes utility access, or if its use is strictly limited to ingress and egress. Under well-established Michigan law, “[t]he use of an easement must be confined strictly to the purposes for which it was granted or reserved.”[16] Exacting “magic words” are not required on a plat to create an easement.[17] When interpreting deeds and plats, Michigan courts seek to *491 effectuate the intent of those who created them.[18]
Plaintiffs assert that, when the original grantors platted the subdivision, they assumed that both the south easement and the central easement included access for utilities. Defendants assert the contrary and add that Lot 2 was always intended to remain vacant.
It is undisputed that the central and south easements are identically labeled “drive easement” on the plat. At the time of platting, the central easement was used only for ingress and egress to Lot 2; there were no utilities on the easement. However, the south easement was used both as a driveway and for telephone and electrical lines to Lots 3, 4, and 5.
We find a strong inference that the words “drive easement” on the central easement were intended to have the same meaning as “drive easement” on the south easement. We conclude that the original grantors would have labeled the easements differently had they intended to allow utilities on the south easement, but not on the central easement. And we conclude that the original grantors intended the central and south easements to have the same scope: both road access for ingress and egress and utility access.
As early as 1883, Michigan courts recognized that a party using a right-of-way for a particular purpose cannot prevent a subsequent party from making the same use of the property. In Bell v Todd, the plaintiffs sought to enjoin the defendant from blocking access to a road that was platted but never constructed.[19] Plaintiff Bell had previously blocked unbuilt roads in the same plat. The Court dismissed the case, stating:
*492 [I]t also appears that Railroad street south of South street is enclosed and occupied by Bell himself, so that he is doing in his own individual interest in respect to this very street precisely what he seeks to enjoin defendant from doing. It would be preposterous to grant the relief prayed for on his application under such circumstances.[20]
Although two streets, not one, are involved here, we believe Bell is instructive. Defendants use their “drive easement” for utilities and seek to prevent plaintiffs from using their “drive easement” for the same purpose. In the words of Justice COOLEY in Bell, to allow such a result would be “preposterous.”
It is apparent, also, that the grantors envisioned that a house would be built on Lot 2 and, by extension, that the central easement would include utilities. This may be gleaned from two drawings by C. W Henkel, one of the original grantors. The first was made in 1969, six years before the subdivision was platted. It shows Lot 2 and the adjacent lot to the east, Lot 1. On Lot 2 is a rectangle with the words “possible house location and dimensions.” The central easement is shown on the drawing.
C. W Henkle made a second drawing in 1978, three years after the subdivision and easements were platted. Like his first drawing, it shows a location on Lot 2 where plaintiffs could build a home. The central easement is visible on the drawing. It is significant that C. W. Henkle included the central easement in his drawings of Lot 2 with a house. He knew then that no house could be erected there until the lot had access to a sewer line. He knew, also, that the central easement was the only likely route to provide that access. Taken together, these drawings provide further evidence of intent that the central drive easement should include utilities.
*493 Finally, contrary to the defendants’ claim, the wording of the restrictive covenant shows that the original grantors always intended that a house could be built on Lot 2: When attempting to discern the parties’ intent, we construe together contemporaneous documents relating to the same transaction.[21] The restrictive covenant on Lot 2 was executed contemporaneously with the plat; therefore, it is relevant in discerning the parties’ intent at the time.
It does not make sense that the original grantors would have inserted language regarding a sewer in the restrictive covenant had they intended that no building ever be placed on Lot 2. If they had really intended to forever prevent building on Lot'2, they would have simply covenanted that no building ever be put there. The reference to a sewer makes sense, however, if the grantors’ intent was to eventually allow a building on Lot 2. This becomes readily apparent when the geographical limitations of the plat are considered. The plat is approximately five acres in size. Only the eastern half is suitable for housing because a bluff runs along the middle of the property, descending to the beach and Lake Michigan. Therefore, the five lots suitable for residences adjoin each other on roughly the 2.5 easternmost acres of land.
In 1975, when the subdivision was platted and the restrictive covenant was written,- none of the lots had access to a municipal sewer system. Septic tanks[22] were *494 the only plausible alternative for waste management on the lots. However, because of concerns over numerous septic systems and leach fields[23] in the relatively small area, a septic system was not an option for every lot.
Cognizant of this problem, the original grantors likely enacted the restrictive covenant to prevent construction of a house on Lot 2 until municipal sewer service became available to it. Hence, the restrictive covenant prevented overloading the small area of land with septic waste. When a municipal sewer system became available to the plat in the late 1970s, the condition in the restrictive covenant was satisfied. The restrictive covenant had served its purpose.
From this we conclude that it was the intent of the original grantors that a house could be built on Lot 2 when a municipal sewer became available. We conclude also that the central “drive easement” was intended, like the south “drive easement,” to provide access to the sewer and other utilities.
EFFECT OF THE RESTRICTIVE COVENANT
Defendants maintain that the restrictive covenant of 1974 intended to prohibit any building on the property until the end of time. They argue that the plain language of the restrictive covenant reflects this.
*495 The restrictive covenant states, “It is hereby covenanted and agreed that no building, structure or dwelling shall be constructed on Lot 2 of said plat unless and until a municipal sewer line is made available to the premises.” Defendants claim that the covenant prohibits building a home on Lot 2 until the owners of Lots 1, 3, and 4, explicitly grant permission to create an easement for municipal sewer service.
This interpretation is not reflected in the words of the covenant. As the trial court pointed out:
A plain reading of this restriction contradicts Defendant’s [sic] argument: if the grantors wanted to forever preclude any construction on Lot 2, the restriction would have stated as much in explicit language by ending the provision after the word “plat” [so that it read “[t]hat it is hereby covenanted and agreed that no building, structure or dwelling shall be constructed on Lot 2 of said plat”]. Defendants’ argument in this regard must therefore fail.
The restrictive covenant merely prevented construction on Lot 2 until sewer service became available to that lot.
THE LDA CANNOT ALTER SUBSTANTIVE PROPERTY RIGHTS
The LDA provides a process for surveying and marking subdivided property. Property information is compiled on a plat that is then recorded with the local municipality. The LDA allows a circuit court to vacate, correct, or revise a recorded plat.[24] Defendants argue that the LDA permits a court to alter a plat map only to properly reflect existing property rights; it cannot affect the substantive rights of the underlying property owners.
When construing the LDA, we are mindful that our primary goal is to ascertain and give effect to the *496 Legislature’s intent.[25] When determining intent, we consider first the language of a statute.[26] The LDA allows a court to “order a recorded plat or any part of it to be vacated, corrected, or revised. . . ,”[27] “Plat” is defined in the act as “a map or chart of a subdivision of land.”[28]
The LDA defines a plat as a map. A plat is a description of the physical property interests on a particular area of land. A map, by itself, is not a determination of substantive property interests. If one “revises” a map of the United States to show Michigan encompassing half of the country, it does not make it so. The LDA was never intended to enable a court to establish an otherwise nonexistent property right. Rather, the act allows a court to alter a plat to reflect property rights already in existence.
In this case, the LDA did not create new substantive property rights when the circuit court altered the plat to reflect that the central easement encompasses utility access. This right existed with respect to the central easement since its inception, when the original grantors recorded the central easement intending it to include utilities. The trial court merely used the LDA as the tool to validate property rights that already existed.
CONCLUSION
In 1975, when the O. T. Henkle subdivision was platted, it was the intent of the grantors that the central easement could include utilities. This holding is supported by the fact that, on the plat, the central ease *497 ment and the south easement are both labeled the same. It is undisputed that the south easement was a driveway and had utilities at the time of platting. The language of the restrictive covenant that runs with the plat supports this holding. The covenant prevented a house from being built on Lot 2 until a municipal sewer system could be made available to the lot. Hence, once a sewer line became available, the covenant allowed a house to be built on Lot 2. Therefore, we affirm the Court of Appeals judgment. However, we reverse its holding concerning the LDA. The LDA cannot be used to create substantive property rights. Regarding the Court of Appeals dicta creating an easement by necessity for utilities, we decline to address whether such an easement is available in Michigan, it being unnecessary to resolve the case. The result reached by the Court of Appeals is affirmed on the basis of the intent of the grantors.
Taylor, C.J., concurred with Kelly, J.
*498 [[Image here]]

 MCL 560.101 et seq.

 Plaintiffs’ property is shown as “2” on the map at the end of this opinion.

 The easement is shown on the lower center of the diagram appended to this opinion and runs from Lake Shore Road to Lot 2.

 Jane Henkle is the mother of plaintiff Janis Tomecek.

 The easement is located on the central easement on the map, where the word “Drive” is printed.

 The easement is labeled “Drive Easement” and shown on the left side of the map.

 The left half of the central easement, where the word “Easement” appears on the map.

 The south easement provided Lots 3, 4, and 5 with telephone and electrical access.

 Plaintiffs and defendants disagree about the meaning of “premises” in the restrictive covenant. Plaintiffs contend “premises” refers to the subdivision as a whole, whereas defendants claim it refers exclusively to Lot 2.

 In 1969, before plaintiffs acquired the property, the original grantors gave them another drawing showing a desirable location for a home on Lot 2.

 Tomecek v Bavas, 276 Mich App 252; 740 NW2d 323 (2007).

 The LDA allows a trial court to vacate, correct, or revise a plat. MCL 560.226(1).

 Blackhawk Dev Corp v Village of Dexter, 473 Mich 33, 40; 700 NW2d 364 (2005).

 Id.

 Eggleston v Bio-Medical Applications of Detroit, Inc, 468 Mich 29, 32; 658 NW2d 139 (2003).

 Delaney v Pond, 350 Mich 685, 687; 86 NW2d 816 (1957).

 See Chapdelaine v Sochocki, 247 Mich App 167, 170; 635 NW2d 339 (2001).

 See Curran v Maple Island Resort Ass’n, 308 Mich 672, 679-681; 14 NW2d 655 (1944).

 Bell v Todd, 51 Mich 21; 16 NW 304 (1883).

 Id. at 28.

 Interstate Constr Co v United States Fidelity & Guaranty Co, 207 Mich 265, 274; 174 NW 173 (1919).

 A septic tank is a small-scale sewage treatment system common in rural areas where there is no access to a municipal sewer line. Wastewater enters the septic tank from a connected residence, and solids settle to the bottom. The remaining water flows out of the tank and is absorbed into the soil, which usually filters out the remaining impurities in the water. However, there must be adequate soil area to handle the waste- *494 water coming from the tank or the surrounding area will be damaged. This is especially likely when septic tanks are located on properly near a body of water (like the property in this case that borders Lake Michigan), because the sandy soil can easily become saturated with chemicals. This pollutes the surrounding area and surface water, causing serious harm to fish, plants, and other wildlife. See Craig G. Cogger, Septic System Waste Treatment in Soil <http://cru.cahe.wsu.edu/CEPublications/ebl475/ebl475.html> (accessed December 12, 2008); see also Septic Systems for Waste Water Disposal, available at <http://www.agwt.org/info/septicsystems.htm> (accessed December 12, 2008).

 A leach field is the area of land where the wastewater from a septic tank is deposited.

 MCL 560.221.

 Neal v Wilkes, 470 Mich 661, 665; 685 NW2d 648 (2004).

 Yaldo v North Pointe Ins Co, 457 Mich 341, 346; 578 NW2d 274 (1998).

 MCL 560.226(1).

 MCL 560.102(a).