# STATE OF MICHIGAN

# COURT OF APPEALS

TOWNSHIP OF LAWRENCE,

Plaintiff-Counterdefendant-
Appellant,

v

WILLIAM QUEEN, JUDY QUEEN, BRADLEY
MILLER, and MISTY MILLER,

Defendants-Counterplaintiffs-
Appellees.

UNPUBLISHED
March 22, 2016

No. 324362
Van Buren Circuit Court
LC No. 14-630851-CH

Before: MURPHY, P.J., and WILDER and BORRELLO, JJ.

PER CURIAM.

This case concerns the ownership of a rectangular strip of land or lot referred to as the "fire-lane" that runs through part of a platted subdivision containing riparian lots on Reynolds Lake, with the fire-lane ending at the water's edge, and efforts by plaintiff Township of Lawrence (the township) to preclude defendants, who are backlot owners, from erecting and maintaining a dock at the end of the fire-lane. The township argued that it owned the fire-lane, although only for use as a fire lane, that defendants simply held, at most, lake access rights via the fire-lane, which did not encompass the right to erect a dock in the lake, and that, regardless, the fire-lane could not be used as a lake access lot for purposes of placement of a dock under applicable township ordinances. The trial court ruled, in the context of summary disposition, that the township *and* defendants Queen held fee simple ownership of the fire-lane; therefore, as fee owners of riparian property, the Queens were permitted to maintain a dock. The trial court further ruled that a dock had been constructed and utilized on a regular basis prior to the adoption of the ordinances relied on by the township to bar a dock, thereby grandfathering maintenance of a dock as a preexisting nonconforming use. The township appeals as of right the trial court's order granting summary disposition in favor of defendants. We affirm.

Defendant Judy Queen, formerly known as Judy Imbordino (hereafter "Queen"), owned real property within the township, and the property bordered the southern shore of Reynolds Lake. In February 1990, per recorded quitclaim deed, Queen conveyed the fire-lane in fee simple to the township, which rectangular strip of land had traversed part of her property. The fire-lane extended to the lake's shoreline. In September 1990, per recorded quitclaim deed, the township conveyed the fire-lane in fee simple back to Queen, expressly reserving for itself an easement to use the strip or lot as a fire lane. In her affidavit, Queen averred that she and her father created the Plat of Rocky Point Shores, which, after recordation of the plat in 1991,

effectively resulted in the division of Queen's land, with the new subdivision consisting of platted riparian lots on Reynolds Lake. Queen retained ownership of unplatted, nonriparian land that was located adjacent to the plat, separated by a roadway, which land was comprised of an undivided nine-acre (backlot) parcel upon which her home was located; the fire-lane provided the property's only access to the lake.

The documents in the lower court record concerning the platting of Rocky Point Shores reflect the involvement of additional proprietors aside from Queen. Under the Michigan Land Division Act, MCL 560.101 *et seq.*, a "proprietor" is "a natural person, firm, association, partnership, corporation, or combination of any of them that holds an ownership interest in land whether recorded or not." MCL 560.102(o). "Plat proprietors are also known as 'plattors.' " *2000 Baum Family Trust v Babel*, 488 Mich 136, 143 n 5; 793 NW2d 633 (2010). There were four total proprietor certificates containing dedicatory language in the plat documents regarding Rocky Point Shores, one by a group of six plattors, one by two bank officer plattors, one by a pair of plattors, and one by Queen, but the language was identical in all four, providing, in relevant part:

> THAT THE LOT LINES EXTEND TO THE WATERS EDGE OF REYNOLDS LAKE AND THAT THE FIRE LANE IS PRIVATE FOR THE USE OF THE TOWNSHIP AS A FIRE LANE ONLY, BUT MAY BE USED AS AN ACCESS TO REYNOLDS LAKE BY JUDY [QUEEN], HER HEIRS AND ASSIGNS.[1.]

Three of the proprietor certificates were actually executed by the plattors, including Queen, back in 1988 and 1989, prior to the two 1990 deeds referenced above, and the final proprietor certificate was signed in November 1990, following the September 1990 quitclaim deed that conveyed the fire-lane from the township to Queen, subject to the township's reservation of an easement. It was not until early 1991, however, that the plat was finalized and recorded, given the time-consuming nature of the platting process, which entailed, in part, obtaining certificates of approval in November and December 1990 from the county treasurer, drain commissioner, county road commissioners, the plat board, and the township.[2]

---

[1] With respect to the quoted language, Queen's proprietor certificate was in all capital letters; two of the other proprietor certificates were not in all capital letters, but, again, the language was the same.

[2] Indeed, the process in this case was even lengthier than normal according to the affidavit of the surveyor who drafted the survey and other platting documents, including the dedicatory provisions in the proprietor certificates, associated with Rocky Point Shores. He averred that he was originally hired by Queen's father in the 1980s to plat land around the lake and that the Plat of Crestview Shores was approved by the township in 1985. The surveyor further asserted, "Later, the name had to change to Rocky Point Shores Plat." He additionally averred that Queen's father initially wished to create a park relative to the area of the fire-lane, but the township requested the creation of the fire-lane for fire-fighting purposes. The surveyor began working for Queen after her father died. The averments seemed to suggest that Queen inherited some if not all of the property from her father.

Accordingly, it is the plat dedication recorded in 1991, and not the 1990 deeds, that is the governing instrument of conveyance in determining the parties' interests in the fire-lane. See MCL 560.253(1) (plat dedication conveys and vests fee simple interests when "plat is certified, signed, acknowledged and recorded"). That said, and as will be fully explained later in this opinion, the 1990 deeds are relevant in ascertaining the intent of the plattors, as well as the township's intent, given our conclusion that the dedication language is ambiguous.

In April 1998, Queen quitclaimed her nonriparian, backlot property to herself and her husband, defendant William Queen. Queen averred in her affidavit that ever "[s]ince my spouse and I married (1988)[,] my spouse and I have had a dock at Reynolds Lake every summer and when we remove the dock for winter we place the dock on the shore of the 'Fire Lane.' " William Queen's affidavit contained a nearly identical averment. Queen additionally expressed in her affidavit that it was known that she no longer had property on the lake and that her house was not on the lake; therefore, it was important to her "that access to Reynolds Lake was available to [her] and others who might purchase [her] realty not located on Reynolds Lake." The Queens both averred that they had paid the real property taxes on the fire-lane since its inception. An online property tax document from Van Buren County was submitted below, showing, relative to the fire-lane, a tax bill and payment summary solely covering the years 2010 to 2013 and an assessment summary solely covering the years 2006 to 2013. The tax document, dated February 20, 2014, identified Queen as the owner of record. This document indicated that the fire-lane was assessed at and had a taxable value of $0 for 2006 and 2007, but for 2008 through 2013, various values were assessed, ranging between $17,000 and $20,600. The tax document further reflected the payment of five tax bills by Queen between 2010 and 2013. Effectively, there was no documentary evidence that countered the Queens's claims in their affidavits that they had paid the taxes on the fire-lane since its inception.

In March 2005, Lawrence Township Zoning Ordinances (LTZO) were adopted by the township, which we shall take into consideration in this appeal. See *Lawrence Twp v Queen*, unpublished order of the Court of Appeals, entered January 13, 2015 (Docket No. 324362) (order granting motion to take judicial notice of LTZO). LTZO, § 9.18 *et seq.*, concern the access and use of lakefront lots. LTZO, § 9.18.3(A) and (D) provide that a lake lot, in order to be utilized to actually access a lake, requires a minimum frontage and lot area corresponding to the general minimum requirements for lots in the zoning district in which the lake lot is located.[3] Here, the fire-lane was located in a district zoned R-3, Waterfront Residential Development, LTZO, § 6.8.1 *et seq.*, and under LTZO, § 6.8.5(A), and the incorporated Schedule A, the minimum area of a lot is set at 21,750 square feet and the minimum width of a lot is set at 100 feet, both relative to an R-3 zoning district. The fire-lane did not meet the square footage or width requirements, as necessary to use the fire-lane to access Reynolds Lake. And a lake "access lot shall be allowed one dock; provided that the access lot meets the minimum dimensional requirements of" the LTZO. LTZO, § 9.18.3(G).

---

[3] These types of ordinances are commonly referred to as "antifunneling" ordinances, which limit lake access by nonriparian lot owners and are employed to prevent congestion, pollution, and an increase in the risk of boating accidents and to protect and promote the public health, safety, and welfare. *Yankee Springs Twp v Fox*, 264 Mich App 604, 607-610; 692 NW2d 728 (2004).

In September 2007, the Queens subdivided their nonriparian, backlot parcel into four separate parcels; the Queen's home was located on one of them and three of the parcels were vacant. In October 2007, the Queens, by warranty deed, conveyed one of the vacant parcels to Richard and Randalyn Kurth, upon which they constructed a house. The warranty deed indicated that the conveyance included "an easement for ingress and egress to Reynolds Lake" over the fire-lane, and the deed also recognized an easement interest by the township in the fire-lane "for use as a fire lane." In June 2008, the township attorney sent letters to the Queens and the Kurths, stating that the township had heard of plans regarding the construction and placement of a dock at the end of the fire-lane and that the township would view such actions as creating a public nuisance in violation of the LTZO and as an interference with the township's property rights.[4] It appears from the record that nothing came of the matter at the time. In August 2013, the Kurths, by warranty deed, sold their improved parcel to defendants Bradley and Misty Miller. The warranty deed provided that the conveyance included "an easement for ingress and egress to Reynolds Lake" over the fire-lane, but there was no mention of any township easement. Bradley Miller asserted in his affidavit that Richard Kurth had informed the Millers that the sale included the right to access the lake by way of the fire-lane, which Mr. Kurth had described as being owned by the Queens.

In January 2014, the township filed a two-count complaint against defendants. Count I sought to quiet title to the fire-lane. The township argued that it had a right, title, and interest in the fire-lane superior to any claim of defendants, that the construction and maintenance of a dock interfered with the township's use of the fire-lane, and that defendants simply had a right to use the fire-lane to access the lake, which did not include maintaining a dock. Count II alleged a public nuisance against defendants on the basis that they were in violation of the LTZO relative to lake access lots, contending that the fire-lane was too small and not wide enough to be an access lot and therefore no dock was permitted. Defendants filed answers to the township's complaint, indicating that the township merely had an easement interest, not a fee simple interest, in the fire-lane and that, regardless, defendants had obtained ownership of the fire-lane and the township's easement interest under the doctrine of adverse possession. Subsequently, defendants filed counterclaims against the township, alleging adverse possession of the fire-lane and the township's fire-lane easement, along with alleging, in the alternative, inverse condemnation on the basis that the township, absent formal condemnation proceedings, was attempting to exact a taking of defendants' fire-lane interests that encompassed the rights to access the lake and maintain a dock.

In March 2014, the township moved for partial summary disposition with respect to defendants' defense of adverse possession, as well as the adverse possession counterclaims, arguing that defendants were barred by statute from claiming adverse possession against a township or municipality. The trial court denied the township's motion. In June 2014, the

---

[4] The township appears to suggest that the 2008 letters created an issue of fact regarding whether a seasonal dock had been maintained since 1988 as claimed by the Queens in their affidavits, where the letters inferred or implied that the erection of a dock would be a new event. The letters are wholly inadequate to create an issue of fact on the matter, which could only have been accomplished with documentary evidence, reflecting personal knowledge, that specifically countered the Queens's affidavits.

township again filed a motion for summary disposition, contending that there was no genuine issue of material fact that all of the requisite elements of adverse possession could not be satisfied, that the counterclaims of inverse condemnation were unsustainable, and that the LTZO precluded the placement of a dock, given their adoption before the Queens subdivided their property into four separate parcels and before the Kurth and Miller conveyances. On July 14, 2014, a hearing was held on the township's motion for summary disposition, and the trial court deferred ruling on the motion until after the parties submitted legal memorandums concerning the impact of MCL 560.253(1), which provides:

> When a plat is certified, signed, acknowledged and recorded as prescribed in this act, every dedication, gift or grant to the public or any person, society or corporation marked or noted as such on the plat shall be deemed sufficient conveyance to vest the fee simple of all parcels of land so marked and noted, and shall be considered a general warranty against the donors, their heirs and assigns to the donees for their use for the purposes therein expressed and no other.

Each side submitted a memorandum claiming fee simple ownership of the fire-lane under MCL 560.253(1) and the language in the dedication. The township maintained that because defendants did not have a fee simple interest in the fire-lane, they had no riparian rights, as necessary to erect and maintain a dock. On August 15, 2014, the trial court issued a written opinion and order, concluding that the township *and* the Queens held fee simple interests in the fire-lane, that the township's fee only permitted use of the fire-lane as a fire lane, that the Queens's fee only permitted use of the fire-lane to access the lake, that because the Queens had a fee simple interest in the fire-lane, they enjoyed riparian rights, which included the right to maintain a dock, that the Queens, given their fee interest, were permitted to convey a lake access easement to the Kurths, which then successfully passed to the Millers, and that the LTZO could not be employed to preclude the placement of a dock, considering that maintaining a dock constituted a preexisting nonconforming use. The trial court further ruled that, as a matter of law, defendants could not establish, and had inadequately alleged, the claims of adverse possession, especially in regard to the hostility element. However, the trial court did rule that summary dismissal was not proper with respect to the inverse condemnation counterclaims.

The trial court subsequently denied the township's motion for reconsideration in which the township argued, in part, that it is improper to increase the intensity of a nonconforming use, which is exactly what occurred when the Queens's property was subdivided into four parcels. The trial court ruled that the LTZO only speaks of disallowing the expansion of nonconforming *structures*, not the *use* of structures. On September 25, 2014, the township, eager to appeal, filed a motion for entry of a final order, noting that the inverse condemnation counterclaims remained pending, but that defendants did not wish to pursue, or there was no need to pursue, those alternative counterclaims in light of the trial court's ruling allowing maintenance of a dock. At a hearing on the motion, the trial court concluded, without objection or argument to the contrary, that there were no more issues in need of litigation, impliedly dismissing the inverse condemnation counterclaims. The township appeals as of right. We note that defendants have not cross appealed the adverse possession or inverse condemnation rulings by the trial court.

This Court reviews de novo a trial court's decision on a motion for summary disposition, *Loweke v Ann Arbor Ceiling & Partition Co, LLC*, 489 Mich 157, 162; 809 NW2d 553 (2011), issues of statutory construction, *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008),

the interpretation and application of ordinances, *City of Riverview v Sibley Limestone*, 270 Mich App 627, 630; 716 NW2d 615 (2006), the legal question regarding the nature and scope of property interests arising under a plat dedication, *2000 Baum Family Trust*, 488 Mich at 143, a trial court's ruling on equitable matters, including a quiet-title determination, *Richards v Tibaldi*, 272 Mich App 522, 528; 726 NW2d 770 (2006), and issues of law generally, *Oakland Co Bd of Co Rd Comm'rs v Mich Prop & Cas Guaranty Ass'n*, 456 Mich 590, 610; 575 NW2d 751 (1998).

"[P]rivate dedications in plats filed after the effective date of MCL 560.253(1), January 1, 1968, are expressly recognized and allowed under Michigan law." *Martin v Beldean*, 469 Mich 541, 542; 677 NW2d 312 (2004). Pursuant to MCL 560.253(1), which we quoted earlier, "a private dedication is deemed a sufficient conveyance to vest the fee simple of all land so marked and noted." *Martin*, 469 Mich at 548.

"When interpreting deeds and plats, Michigan courts seek to effectuate the intent of those who created them." *Tomecek v Bavas*, 482 Mich 484, 490-491; 759 NW2d 178 (2008); see also *Higgins Lake Prop Owners Ass'n v Gerrish Twp*, 255 Mich App 83, 96; 662 NW2d 387 (2003). Our Supreme Court has stated that "[t]he intent of the plattors must be determined from the language they used [in the dedication] *and* the surrounding circumstances." *Thies v Howland*, 424 Mich 282, 293; 380 NW2d 463 (1985) (emphasis added) (examining the question whether a plat's dedication was intended to convey a fee in a walk or merely granted an easement), citing *Bang v Forman*, 244 Mich 571, 576; 222 NW 96 (1928) ("The language of the grant, considered in connection with . . . the physical facts and circumstances existing at the time, clearly shows that the grantor did not intend such use of the [dedicatory] easement as is proposed by the defendants."); see also *Dyball v Lennox*, 260 Mich App 698, 708; 680 NW2d 522 (2003) (quoting the above-quotation from *Thies*); *Dobie v Morrison*, 227 Mich App 536, 540; 575 NW2d 817 (1998) (observing, on the basis of *Thies*, that "[t]he intent of the plattors should be determined with reference to the language used in connection with the facts and circumstances existing at the time of the grant"). We note that in *Thies*, the Michigan Supreme Court's directive to examine the language in a dedication *and* the surrounding circumstances in order to discern the plattor's intent was not restricted to ambiguous dedication language. However, in *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003), our Supreme Court ruled that "[w]here the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted[,]" and that "[i]f the text of [an] easement is ambiguous, extrinsic evidence may be considered by the trial court in order to determine the scope of the easement." The Supreme Court in *Little* held that this Court's statement in the underlying appeal in the *Little* case that the scope of an easement is to be determined by the easement's language *and* the surrounding circumstances "was clearly inconsistent with the well-established principles of legal interpretation . . . and [was] thus incorrect." *Id.* at 700-701 n 2. The *Little* Court did not expressly state that it was overruling *Thies* on the matter or precedent upon which *Thies* was based; however, the *Little* panel in this Court had relied on "the rule in *Thies*" in setting forth the later-rejected principle of construction. *Little v Kin*, 249 Mich App 502, 512; 644 NW2d 375 (2002), aff'd 468 Mich 699 (2003). The fact that our Supreme Court was specifically addressing plat dedications in *Thies* and was specifically addressing easements in *Little* would seem to be inconsequential; many easements are created in plat dedications. Ultimately, it is unnecessary to determine whether the Supreme Court in *Little* effectively overruled *Thies* on the interpretation-principle issue, given that we conclude that the plat dedication in this case was ambiguous relative to the identity of the grantee of the fee simple interest in the fire-lane, thereby

-6-

necessitating consideration of the surrounding circumstances at the time of the grant by dedication.

In *Thies*, 424 Mich at 287-288, our Supreme Court reflected on some basic principles regarding riparian versus nonriparian rights that are relevant here:

> Land which includes or is bounded by a natural watercourse is defined as riparian. Persons who own an estate or have a possessory interest in riparian land enjoy certain exclusive rights. These include the right to erect and maintain docks along the owner's shore, and the right to anchor boats permanently off the owner's shore. Nonriparian owners and members of the public who gain access to a navigable waterbody have a right to use the surface of the water in a reasonable manner for such activities as boating, fishing and swimming. [Citations omitted.]

Accordingly, and without yet reaching the issues concerning the LTZO, if Queen acquired or retained the fee simple interest in the fire-lane on recordation of the plat in 1991, she would have held title to riparian land, allowing her, generally speaking, to erect and maintain a dock. We first conclude that to the extent that the trial court ruled that there existed two estates in fee simple, one held by the township and one held by the Queens, the trial court erred. "There can exist but one estate in fee simple to a particular parcel of land." *In re McBride's Estate*, 253 Mich 305, 307; 235 NW 166 (1931). To be fair, it does appear that the trial court was merely ruling that there was a single fee estate and that the conveyance of the fire-lane by dedication created a joint tenancy or a tenancy in common as between the Queens and the township.[5] However, we also conclude that this ruling was in error. We hold that, as a matter of law, Queen retained a fee simple interest in the fire-lane under the dedication, with the plattors, including Queen, dedicating the fire-lane to Queen, subject to an easement by the township to use the fire-lane as a fire lane only.

Again, the pertinent dedicatory language provided that "the fire lane is private for the use of the township as a fire lane only, but may be used as an access to Reynolds Lake by [Queen], her heirs and assigns." This language, by itself, is ambiguous with respect to which party held the fire-lane fee upon the recording of the plat. On one hand, the dedication could reasonably be construed as reflecting the plattors' intent to have Queen simply retain her "private" fee simple interest in the fire-lane. Language merely indicating that the fire-lane "is private" would not appear to constitute words in the nature of a dedicatory conveyance or grant of a fire-lane fee to the township. See MCL 560.253(1). The phrase that followed next in the dedication, i.e., "for *the use* of the township as a fire lane only" (emphasis added), is also not ordinarily reflective of a dedicatory conveyance or grant of a fee simple interest. Rather, the phrase is consistent with terminology typically used to convey or grant an easement. See *Killips v Mannisto*, 244 Mich App 256, 258; 624 NW2d 224 (2001) ("An easement is a right to use the land of another for a specific purpose."); see also *Bowen v Buck & Fur Hunting Club*, 217 Mich App 191, 192; 550

---

[5] We do note that the record does not appear to contain any legal instrument revealing a conveyance of the fire-lane by Queen to William Queen and Queen, jointly, as was done in regard to the nonriparian, backlot parcel. Accordingly, with respect to the fire-lane *fee* dispute in connection with quieting title, it is between Queen and the township.

NW2d 850 (1996). In *Thies*, 424 Mich at 293, our Supreme Court observed that a reference to "use," "standing alone[,] does not ordinarily denote the passing of a fee interest in land." The final language in the dedication alluding to Queen's right to use the fire-lane to access the lake does appear to be reminiscent of a reservation of an easement on the conveyance of a fee simple. See *City of Huntington Woods v Detroit*, 279 Mich App 603, 621; 761 NW2d 127 (2008) (the granting of a right-of-way generally conveys an easement). However, the lake-access language, by employing the prefatory phrase "but may be used," could also reasonably be construed as merely indicating that the township's easement to use the fire-lane as a fire lane did not preclude, or was subordinate to, Queen's use of the fire-lane to access the lake, absent any implication in regard to the fee.

On the other hand, the dedication could be interpreted as having conveyed the fee simple interest in the fire-lane to the township for its "private" use, but solely as a fire lane. The granting of a fee simple interest in land as contained in the words of a dedication may limit or restrict the interest to a particular use. MCL 560.253(1); *Martin*, 469 Mich at 549 n 19; see also *City of Huntington Woods*, 279 Mich App at 621-622 (discussing fees subject to a condition subsequent). And the lake-access language in the dedication pertaining to Queen could reasonably be construed as having solely provided her an easement over the fire-lane, absent any fee estate being acquired or retained by Queen in the fire-lane under the prior language in the dedication. Moreover, as apparently determined by the trial court, the dedication could be interpreted as having transferred a jointly-held fee simple estate in the fire-lane to, and as between, the township and Queen, limited to the uses outlined in the dedication – a fire lane and a right-of-way to the lake. MCL 560.253(1); *Martin*, 469 Mich at 549 n 19. We have even entertained the possibility that the fee simple interest in the fire-lane was being privately dedicated to future lot owners in the plat, subject to easements by both Queen and the township. See *Martin*, 469 Mich at 549 (private dedication of lot conveyed a fee simple interest to the plat's lot owners). In sum, the language in the dedication is hopelessly ambiguous in ascertaining the holder of the fire-lane fee. However, clarity of fee arises once we examine the events and circumstances surrounding the platting process that transpired in this case; particularly, the execution of the 1990 deeds.

When we contemplate Queen's February 1990 quitclaim deed transferring the fire-lane to the township in fee simple, which occurred after Queen had executed her proprietor certificate, we are struck by the language indicating that the fee conveyance was of "[a] *private* firelane." (Emphasis added.) Use of the word "private" would appear to have had some correlation to the dedicatory language that referred to the fire-lane as being "private." Given that the February 1990 deed conveyed a straightforward fee simple interest in the fire-lane to the township, it is not unreasonable to believe that there existed *an initial intent* by the plattors to convey a fire-lane fee to the township in the plat dedication, limited in use, while reserving a lake-access easement for Queen. But the September 1990 quitclaim deed conveying the fire-lane back to Queen in fee simple subject to an easement by the township made overwhelmingly clear that any intent to pass the fire-lane fee to the township in the dedication upon recordation had evolved to an intent to now preserve Queen's fire-lane fee, subject to a township easement that was subordinate to Queen's right to access the lake. This becomes abundantly plain in light of the fact that the various governmental officials and entities involved in plat review approved the plat in the two or three months immediately following the execution and recording of the September 1990 deed, which approvals were then shortly followed by the recording of the plat. There is no indication in the record that the September 1990 deed was thrust upon an unwilling Queen. And

considering the ambiguous dedicatory language, which could reasonably be construed consistently with the September 1990 deed, there would not have been any need to alter the dedicatory language. Thus, at the time the plat was finally recorded and interests were conveyed, the intent was to provide Queen with the fire-lane fee and the township with a fire-lane easement.

Any doubts about fee ownership that might remain are erased by the events that occurred after the plat was recorded, where the Queens paid the taxes on the fire-lane, where the county apparently viewed Queen as the "[o]wner[] of record" for purposes of property taxes, and where the Queens maintained a dock for years, exercising a right enjoyed by riparian owners. See *Hulin v Stevens*, 53 Mich 93, 95; 18 NW 569 (1884) (evidence showing that party claiming title had paid no taxes on the land is admissible to rebut party's claim of ownership).[6] Additionally, we find quite telling the 2008 letters sent by township counsel to the Queens and Kurths, in which counsel referred to the township's rights "*retained* at the time of conveyance" and informed them that the fire-lane "is limited by the *easement* retained by the [t]ownship." (Emphasis added.) Reservation or retention of an easement by a vendor necessarily indicates that the fee lies with another; township counsel did not even remotely suggest that the township owned the fire-lane. In sum, we hold, as a matter of law and upon which there is no genuine issue of material fact, that the fire-lane fee simple interest was intended to be held by Queen. And, generally speaking, riparian owners have the right to maintain a dock. *Thies*, 424 Mich at 287-288; *Dyball*, 260 Mich App at 705 ("Erecting or maintaining a dock near the water's edge is a riparian . . . right.") (citations omitted).

While Queen has title to the fire-lane, this would not automatically mean that she was entitled to erect and maintain a dock, if doing so would unreasonably interfere with the township's easement. The owner of a fee that is subject to an easement is entitled to make any use of the land as long as it is consistent with the easement owner's rights and does not interfere with the reasonable use of the easement. *Morrow v Boldt*, 203 Mich App 324, 329; 512 NW2d 83 (1994); *Lee v Fidelity Life & Income Mut Ins Co*, 2 Mich App 82, 86-87; 138 NW2d 545 (1965). In the township's complaint, there was an allegation, absent any elaboration, that a dock interfered with the township's easement. However, this issue was not developed below, nor on appeal, factually or by way of argument, except for township counsel's interesting historical reference at oral argument about a time, apparently now passed, when firetrucks would actually pull into a body of water in fighting nearby fires. Accordingly, there is no basis to allow the suit to proceed on an interference-with-easement issue.

Next, we do question, even had Queen simply held an easement for lake-access purposes and no riparian fee interest, whether she would be prohibited from maintaining a dock. This Court's decision in *Dyball* indicated that language comparable to the lake-access language at issue here is unambiguous and does "not show an intent to grant a right to construct and maintain a dock," even though there was evidence in *Dyball* that a dock had been erected and maintained

---

[6] In Queen's affidavit, she alluded to her home and other property not being on the lake, necessitating the lake-access language. We do not view these averments as a concession that she did not have a fee simple interest in the fire-lane. Rather, when considered in the proper context, the averments were in reference to Queen's unplatted, nonriparian parcel, not the fire-lane.

when the easement at issue was granted. *Dyball*, 260 Mich App at 708-709. The *Dyball* panel did not appear to address the legal concept of a "latent" ambiguity, which was later explored at length by our Supreme Court in *Shay v Aldrich*, 487 Mich 648; 790 NW2d 629 (2010). In examining the scope of rights under a release, the *Shay* Court noted that contracts are subject to the parol evidence rule, which precludes the use of extrinsic evidence when interpreting unambiguous contractual language, that ambiguous contracts open the door to the admission of extrinsic evidence to establish the actual intent of the parties, and that an ambiguity can be either patent or latent. *Id.* at 667. The Court further elaborated:

> This Court has held that extrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document. However, extrinsic evidence may be used to show that a latent ambiguity exists. . . . A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the " 'necessity for interpretation or a choice among two or more possible meanings.' " To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation. Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue. [*Id.* at 667-668 (citations omitted).]

The *Shay* Court proceeded to indicate that it was necessary to consider whether a latent ambiguity arose from undisputed extrinsic evidence presented by one of the parties. *Id.* at 671-672.

Here, there is no genuine issue of material fact that before and after the plat was dedicated and recorded the Queens had maintained a dock. Thus, although the lake-access language, standing alone, may not have revealed a patent ambiguity as to whether a dock was permitted, the uncontradicted extrinsic evidence of the existence of a dock created a latent ambiguity with respect to whether the lake-access language contemplated the erection and maintenance of a dock. Had we reached the issue, assuming no conflict with *Dyball*, we would lean to a conclusion, as a matter of law, that the ambiguity must be resolved in favor of a determination that the lake-access language envisioned the maintenance of a dock.

Finally, with respect to the township's arguments under the LTZO, we find them unavailing. There can be no dispute that, if applicable, the LTZO would require a ruling that the fire-lane did not constitute a lake-access lot, given its inadequate square footage and width, thereby precluding construction or maintenance of a dock. The issues that arise concern nonconforming uses and the expansion of those uses. In *Edw C Levy Co v Marine City Zoning Bd of Appeals*, 293 Mich App 333, 341-342; 810 NW2d 621 (2011), this Court stated:

> An existing nonconforming use is a vested right in the use of particular property that does not conform to zoning restrictions, but is protected because it lawfully existed before the zoning regulation's effective date. Nonconforming uses may not generally be expanded, and one of the goals of local zoning is the gradual elimination of nonconforming uses. The policy of the law is against the extension or enlargement of nonconforming uses, and zoning regulations should

be strictly construed with respect to expansion. The continuation of a nonconforming use must be substantially of the same size and the same essential nature as the use existing at the time of passage of a valid zoning ordinance. Moreover, the nonconforming use is restricted to the area that was nonconforming at the time the ordinance was enacted. Nonconforming use involves the physical characteristics, dimensions, or location of a structure, as well as the use of the premises. [Citations omitted.]

Queen's dock lawfully existed, as discussed in addressing the fee issue, before the adoption of the LTZO; it was a valid nonconforming use giving rise to a vested and protected right to continue that use following the LTZO's effective date. With respect to the question of expansion of the nonconforming use as allegedly caused by, post-adoption of the LTZO, the subdividing of the Queens's nonriparian (backlot) parcel into four parcels and the Millers' current ownership of a home on one of those parcels, we conclude that, at this point and on the existing record, there has been no extension or expansion of the nonconforming use sufficient to invoke application of the LTZO. There is no evidence that the size of the dock has been increased, that there have been additions to the dock, or that a second dock has been erected since the adoption of the LTZO. Mr. Miller averred that the Millers "used the dock that the Queens placed in the Lake." Although there are now two couples enjoying the use of the same dock, we conclude, as a matter of law, that the continuation of the nonconforming use was substantially of the same size and the same essential nature as the use existing at the time of passage of the LTZO. Moreover, it was the presence of the dock itself that was the focus of the township's suit, not the fact that the Millers were now joining the Queens in using the dock. Reversal is unwarranted.

Affirmed. Having fully prevailed on appeal, defendants are awarded taxable costs under MCR 7.219.


/s/ William B. Murphy
/s/ Kurtis T. Wilder
/s/ Stephen L. Borrello

-11-